**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | |
|---|---|
| **EVANSTON INSURANCE COMPANY,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )   **CIVIL ACTION NO. 5:15-CV-247 (MTT)** |
| | ) |
| **SANDERSVILLE RAILROAD** | ) |
| **COMPANY,** | ) |
| | ) |
| **Defendant.** | ) |
| | ) |

## ORDER

The parties in this insurance coverage dispute have filed cross motions for

summary judgment.  (Docs. 18, 20).  In its three-count Complaint, Plaintiff Evanston

Insurance Company,[1] seeks a declaratory judgment as to Evanston's obligations to its

insured—Defendant Sandersville Railroad Company—in relation to the claim of a

Sandersville Railroad employee, John Flowers.

Generally, Evanston claims that the pollution exclusion in its comprehensive

general liability ("CGL") policy excludes coverage for Flowers's claim and that Evanston

is entitled to recover defense costs pursuant to a reservation of rights letter.  In Count I,

Evanston "requests a declaration that the claims alleged against Sandersville Railroad

in the [Flowers suit] are not covered . . . and that [Evanston] has no duty to defend any

party for the claims."  (Doc. 1, ¶ 28).  In Count II, Evanston "requests a declaration that

the claims alleged against Sandersville Railroad in the [Flowers suit] are not covered . .

. and that [Evanston] has no duty to indemnify any party for the claims."  (*Id.*, ¶ 30).  In

Count III, Evanston "requests a declaration that the claims alleged against Sandersville

---

[1]    The original plaintiff in this suit was Essex Insurance Company.  (Doc. 1).  Evanston was substituted
after Essex merged into Evanston on June 30, 2016.  (Docs. 36, 39, 40).

Railroad in the [Flowers suit] are not covered . . . and that [Evanston] is entitled to reimbursement from Sandersville Railroad for any and all attorney's fees and costs it pays for defense of Sandersville Railroad against the claims."  (*Id.*, ¶ 32).

The parties filed cross-motions for summary judgment.[2]  (Docs. 18; 20).  For the following reasons, Evanston's motion is **GRANTED in part and DENIED without prejudice in part**, and Sandersville Railroad's motion is **DENIED**.

## I.   BACKGROUND

The relevant facts are undisputed, and, significantly, are not limited to the allegations of the Flowers complaint.  Rather, the parties have put additional facts in the record to assist in the determination of whether Evanston's pollution exclusion excludes coverage for Flowers's claims.

Sandersville Railroad Company operates a short line railroad.  (Doc. 19-1, ¶ 2).  As a railroad, Sandersville Railroad is not subject to state workers' compensation laws.  *New York Cent. R. Co. v. Winfield*, 244 U.S. 147 (1917).  Rather, its employees have the protection of the Federal Employees Liability Act ("FELA"), 45 U.S.C. § 51, *et seq.*  To insure its FELA obligations, Sandersville Railroad purchased from Evanston a CGL policy with "premier railroad" liability coverage.  (18-3 at 17; 19-1, ¶ 3).  In most respects, the policy is a typical CGL policy.  However, the standard employer's liability exclusion, which generally excludes coverage for claims by employees, expressly does not apply to liability imposed by FELA.  (Doc. 19-1, ¶¶ 22-23).  As a result, the policy provides coverage for FELA claims brought by Sandersville Railroad employees.  (Doc. 19-1, ¶ 23).  The policy has a standard pollution exclusion.  (Docs. 19-1, ¶ 30; 23-2, ¶

---

[2]   It is not entirely clear whether Sandersville Railroad moved for summary judgment as to Count III. (Doc. 18 at 2-3).  If it did, the motion is denied without prejudice (as to the matters addressed in Section 2.C., *Reimbursement of Defense Costs*, *infra*).

20).  Unlike the employer's liability exclusion, there is no specific FELA exception to the pollution exclusion.

In 2013, Flowers provided Sandersville Railroad with notice of his FELA claim. (Docs. 19-1, ¶ 16; 23-2, ¶ 2).  Although that notice is not in the record, Flowers' attorney subsequently sent Sandersville Railroad a demand letter in which he alleged that Flowers "contracted 'welders' lung' disease from occupational exposure to welding fumes."  (Doc. 18-12 at 2).  When Sandersville Railroad notified Evanston of the claim, Evanston issued a "bilateral" reservation of rights.  (Docs. 20-3; 23-2, ¶ 4).  Relevantly, Evanston reserved the right to decline coverage for the claim pursuant to its pollution exclusion.  (Doc. 23-2, ¶ 5).  Evanston also stated in the reservation of rights that upon the exhaustion of Sandersville Railroad's self-insured retention, it would "pay the reasonable cost of defense for the insured's chosen defense counsel, subject to a reservation of rights to withdraw from providing the defense upon a determination that there is no coverage."  (Docs. 20-3 at 7; 23-2, ¶ 8).  Finally, Evanston stated that it "reserves the right to reimbursement of defense costs paid if it establishes it owes no coverage to the insured."  (Docs. 20-3 at 7; 23-2, ¶ 7).

In 2014, Flowers filed suit against Sandersville Railroad alleging, pursuant to FELA, that Sandersville Railroad negligently failed to provide adequate breathing protection, to ventilate the areas where he was required to weld, to "implement proper procedures and safeguards for [his] proper breathing protection," to warn and train him about occupational lung disorders, and to provide proper supervision.  (Docs. 1-2, ¶ 6; 19-1, ¶ 11; 23-2, ¶ 9).  Flowers's complaint alleged only that he "was diagnosed with advanced lung disease."  (Doc. 1-2, at 3).  By the time the parties moved for summary judgment in this action, it was undisputed that Flowers suffered from siderosis or welders' lung.  (Doc. 23-1, ¶ 1).  This occupational lung disease was caused by Flowers' exposure to welding fumes containing iron.  *Id.*

After Sandersville Railroad exhausted its self-insured retention, it tendered the defense of the claim to Evanston.  (Docs. 19-1, ¶¶ 44-45; 23-2, ¶ 13).  Evanston then issued a second bilateral reservation of rights letter.[3]  (Docs. 19-1, ¶ 45; 23-2, ¶ 14).  Evanston again reserved the right to decline coverage pursuant to its pollution exclusion and again "reserved" the right to seek reimbursement of the costs of defending the suit.  (Doc. 23-2, ¶ 15).

Eventually, Sandersville Railroad settled Flowers's claim with no contribution from Evanston.  (Doc. 19-1, ¶ 51).  Evanston then filed this declaratory judgment action seeking a determination that its policy did not provide coverage for Flowers's claim and to recover from Sandersville Railroad the defense costs for which Evanston paid.

## II.    DISCUSSION

### A.    Standard of Review

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A factual dispute is genuine only if 'a reasonable jury could return a verdict for the nonmoving party.'"  *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)).  The burden rests with the moving party to prove that no genuine issue of material fact exists.  *Id.*  The party may support its assertion that a fact is undisputed by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1)(A).

---

[3]    The second reservation of rights letter quotes the wrong policy provision—Coverage provision A.1.a.(1), addressing defense obligations *prior* to the exhaustion of Sandersville Railroad's self-insured retention—instead of Coverage provision A.1.a.(2), addressing defense obligation *after* the exhaustion of Sandersville Railroad's self-insured retention.  (Docs. 18-3 at 18; 20-5 at 3-4).

"If the moving party bears the burden of proof at trial, the moving party must establish all essential elements of the claim or defense in order to obtain summary judgment." *Anthony v. Anthony*, 642 F. Supp. 2d 1366, 1371 (S.D. Fla. 2009) (citing *Four Parcels of Real Prop.*, 941 F.2d at 1438). The moving party must carry its burden by presenting "credible evidence" affirmatively showing that, "on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the nonmoving party." *Four Parcels of Real Prop.*, 941 F.2d at 1438. In other words, the moving party's evidence must be so credible that, if not controverted at trial, the party would be entitled to a directed verdict. *Id.*

"If the moving party makes such an affirmative showing, it is entitled to summary judgment unless the nonmoving party, in response, 'come[s] forward with significant, probative evidence demonstrating the existence of a triable issue of fact.'" *Id.* (quoting *Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.2d 1472, 1477 (11th Cir. 1991)) (alteration in original). However, "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. . . . The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Thus, the Court "'can only grant summary judgment if everything in the record demonstrates that no genuine issue of material fact exists.'" *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012) (quoting *Tippens v. Celotex Corp.*, 805 F.2d 940, 952 (11th Cir. 1986)).

In contrast, "[w]hen the *nonmoving* party has the burden of proof at trial, the moving party is not required to 'support its motion with affidavits or other similar material *negating* the opponent's claim.'" *Four Parcels of Real Prop.*, 941 F.2d at 1437 (quoting *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986)). The moving party "simply may show . . . that there is an absence of evidence to support the nonmoving party's case." *Id.* at 1438 (internal quotation marks and citation omitted). "Assuming the moving party

has met its burden, the non-movant must then show a genuine dispute regarding any issue for which it will bear the burden of proof at trial." *Info. Sys. & Networks Corp.*, 281 F.3d at 1224-25 (citing *Celotex Corp.*, 477 U.S. at 324).

The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party files a motion. *See Am. Bankers Ins. Grp. v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005). "Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984) (internal quotation marks and citation omitted). The Court will consider each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration. *See Am. Bankers Ins. Grp.*, 408 F.3d at 1331.

**B.     The Interpretation of the Pollution Exclusion**

In *Georgia Farm Bureau Mutual Insurance Co. v. Smith*, 298 Ga. 716, 784 S.E.2d 422 (2016), the Georgia Supreme Court succinctly summarized the rules of construction applied by Georgia courts when interpreting insurance policies.

> As with any contract, in construing the terms of an insurance policy, we look first to the text of the policy itself. Words used in the policy are not given their "usual and common" meaning, and the policy "should be read as a layman would read it and not as it might be analyzed by an insurance expert or an attorney." Where the contractual language is explicit and unambiguous, "the court's job is simply to apply the terms of the contract as written, regardless of whether doing so benefits the carrier or the insured." This is so because Georgia law permits an insurance company to "fix the terms of its policies as it sees fit, so long as they are not contrary to law," thus companies are "free to insure against certain risks while excluding others." However, when a policy provision is susceptible to more than one meaning, even if each meaning is logical and reasonable, the provision is ambiguous and, pursuant to O.C.G.A. § 13-2-2(5), will be construed strictly against the insurer/drafter and in favor of the insured.

*Id.* at 719, 298 S.E.2d at 424 (citations omitted).  Of course, Evanston bears the burden of demonstrating that its pollution exclusion excludes coverage for an otherwise covered claim.  *See Interstate Life & Acc. Ins. Co. v. Wilmont*, 123 Ga. App. 337, 337, 180 S.E.2d 913, 913 (1971).

Evanston acknowledges that its CGL policy covers bodily injury, including FELA occupational disease claims, caused by "continuous or repeated exposure to substantially the same general harmful conditions."  (Doc. 19-1, ¶ 19).  Clearly, Flowers's injury falls within this grant of coverage.  But Evanston argues that the pollution exclusion unambiguously excludes coverage for Flowers's claim.  (Doc. 20-1 at 1).  The pollution exclusion purports to exclude coverage for injuries "arising out of the . . . discharge, dispersal, seepage, migration, release or escape of 'pollutants.'"  (Doc. 18-3 at 20).  The policy defines "pollutant" as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, and waste."  (Doc. 18-3 at 44).  Evanston argues that whatever lingering doubt there may have been about the scope of pollution exclusions under Georgia law, that doubt has been firmly dispelled by the Georgia Supreme Court's recent decision in *Georgia Farm Bureau*.  (Doc. 27 at 3).  Sandersville Railroad acknowledges that Georgia courts have adopted an expansive view of pollution exclusions generally and have broadly interpreted "pollutants," but, relying on the Eleventh Circuit's decision in *Bituminous Casualty Corp. v. Advanced Adhesive Technology, Inc.*, 73 F.3d 335 (11th Cir. 1996), Sandersville Railroad argues that it can weave its way through this adverse authority. (Doc. 18-1 at 8-12).  The Court disagrees.

There has long been a split among jurisdictions on the question of whether the standard CGL pollution exclusion bars coverage for all injuries caused by pollutants, or whether the exclusion applies only to occurrences arising from traditional environmental pollution.  It is not necessary to dwell in depth on the history of this debate because the Georgia Supreme Court has firmly rejected the argument that pollution exclusions apply only to claims arising from traditional environmental pollution.

The Georgia Supreme Court first addressed directly the competing interpretations of modern pollution exclusions in *Reed v. Auto-Owners Ins. Co.*, 284 Ga. 286, 667 S.E.2d 90 (2008).  In *Reed*, the supreme court affirmed a divided seven-judge Georgia Court of Appeals decision holding that a pollution exclusion excluded coverage for claims alleging injury caused by exposure to carbon monoxide.  *Id.* at 286, 667 S.E.2d at 91.  In the process, the court noted the dissenting judges' reliance on the traditional environmental pollution interpretation of pollution exclusions.

> Looking through the prism of what one might expect to find based on [the] "purpose" and "historical evolution," [of the pollution exclusion,] the dissenters concluded that the pollution exclusion clause "*can*" reasonably be read as being "limited to what is commonly or traditionally considered environmental pollution."

*Id.* at 288, 667 S.E.2d at 92.  The Georgia Supreme Court flatly rejected this view: "Nothing in the text of the pollution exclusion clause supports such a reading."  *Id.*  By resorting to "extra-textual sources of interpretation," the dissent found ambiguity "where there is none."  *Id.*[4]

---

[4]  Two justices dissented.  Presiding Justice Hunstein argued in dissent that the majority's interpretation of the pollution exclusion "functions as a gaping loophole into which the insurer can seek haven in situations in which no reasonable insured would have envisioned the exclusion to apply."  *Id.* at 289-90, 667 S.E.2d at 93.  To make her point, Justice Hunstein provided an example: "Take, for example, a scenario in which a malfunctioning dishwasher overflows, flooding the kitchen and warping its floor; is the

Any debate on Georgia's stance in the split over the interpretation of pollution exclusions ended with the Georgia Supreme Court's unanimous decision in *Georgia Farm Bureau*.  There, the supreme court granted certiorari to determine whether claims by apartment residents against their landlord for injuries resulting from ingestion of lead from deteriorating lead-based paint were excluded from coverage by a pollution exclusion.  *Ga. Farm Bureau*, 298 Ga. at 716, 784 S.E.2d at 422-23.  The Georgia Court of Appeals had reasoned that an insured reasonably could have thought that the pollution exclusion applied only to "industrial pollution."  *Smith v. Ga. Farm Bureau Mut. Ins. Co.*, 331 Ga. App. 780, 785, 771 S.E.2d 452, 456 (2015).  As a result, the pollution exclusion was ambiguous and, construing the policy against Georgia Farm Bureau, the court held that the insurer failed to establish that lead paint was a pollutant.  *Id*.

The Georgia Supreme Court granted certiorari and reversed.  *Ga. Farm Bureau*, 298 Ga. at 716, 784 S.E.2d at 422-23.  The supreme court began by stating categorically that Georgia Farm Bureau's pollution exclusion, which is identical in every material way to Evanston's pollution exclusion, is "an absolute pollution exclusion clause which precludes recovery for bodily injury or property resulting from exposure to *any* pollutant."  *Id.* at 719, 784 S.E.2d at 425.  Acknowledging that insurers initially tailored pollution exclusions to counter traditional environmental pollution claims, the court noted that insurers had broadened their exclusions to bring within their scope nontraditional environmental pollution claims, hence their characterization as "absolute"

_____

water, by virtue of its ability to damage the floor, a 'contaminant' or 'irritant' falling within the pollution exclusion?  Under the majority's holding, the answer, absurdly, would seem to be yes."  *Id.* at 289, 667 S.E.2d at 93.  Justice Hunstein's example is an extreme one, but it does serve to illustrate the breath of pollution exclusions in states that view them to be absolute, rather than to cover only claims of traditional environmental pollution.

pollution exclusions.  *Id.* at 719-20, 784 S.E.2d at 425.  Given that interpretation of the pollution exclusion, the court unanimously concluded that Georgia Farm Bureau's pollution exclusion "unambiguously governs the factual scenario in this case."  *Id.* at 721, 784 S.E.2d at 426.

Thus, Evanston's pollution exclusion is absolute, and it would clearly be error for this Court to interpret the exclusion, as the Georgia Court of Appeals did in *Smith*, to apply only to traditional, or industrial, pollution claims.  But Sandersville Railroad argues that the Eleventh Circuit in *Bituminous Casualty* found an ambiguity in the pollution exclusion that is unaffected by the Georgia Supreme Court's holding that pollution exclusions like Evanston's are absolute.  (Doc. 28 at 4-9).  In *Bituminous Casualty*, the insured, a manufacturer of adhesive products, tendered to Bituminous the defense of a products liability claim alleging that the plaintiff's decedent died while installing carpet because of vapors from the insured's adhesive.  73 F.3d at 336.  Bituminous, relying on the pollution exclusion, denied coverage.  *Id.*  The district court found the pollution exclusion ambiguous and granted the insured's motion for summary judgment.  *Id.* at 336-37.

On appeal, the Eleventh Circuit focused not on the meaning of pollutant, but rather on the way the plaintiff was exposed to vapors from the adhesive.  Specifically, the court considered whether the injury arose "out of the . . . discharge, dispersal, or release or escape of" the vapors from the adhesive.  *Id.* at 336.  The question, the court reasoned, was "whether the terms 'discharge,' 'dispersal,' 'release,' or 'escape' precisely described the process that produced the vapors that allegedly killed" the plaintiff's decedent.  *Id.* at 337.

-10-

The court first concluded that the vapors from the adhesive could best be described as an "emission." *Id.* at 338. The court then examined, term by term, whether the emission of the vapors unambiguously fell within the terms of the pollution exclusion. *Id.* at 338-39. Beginning with "discharge," the court noted that some but not all definitions of discharge included emissions. *Id.* at 338. Because "discharge" had more than one reasonable meaning, the court applied the meaning that favored the insured, i.e., the meaning that did not encompass emissions. *Id.* This led the court to "find that 'discharge' does not unambiguously describe the 'emission' at issue. *Id.* Similarly, the remaining terms of the pollution exclusion—dispersal, release, and escape—did not precisely describe the emission of the vapors. *Id.* at 338-39. Thus, pretermitting the question of whether the vapors from the adhesive were pollutants, the pollution exclusion did not unambiguously encompass the emission of the vapors. *Id.*

Of critical significance to the issue before this Court, the Eleventh Circuit gave considerable weight to what it considered the purpose of the pollution exclusion. "The pollution exclusion clearly contemplates shielding Bituminous from liabilities associated with environmental contamination. Bituminous's contrary position—that the clause excludes coverage for a consumer's claim for damages arising out of the intended use of the insured's product—is a strained one." *Id.* at 339. In other words, the Eleventh Circuit's conclusion was shaped by the view that pollution exclusions encompass only claims for traditional environmental pollution.[5]

_____

[5]   Indeed, *Bituminous Casualty* relied heavily on *Claussen v. Aetna Casualty & Surety Co.*, 259 Ga. 333, 387 S.E.2d 686 (1989). *Claussen* addressed an earlier permutation of the pollution exclusion that likely was limited to traditional environmental pollution claims. The pollution exclusion in *Claussen* applied only if the "discharge, dispersal, release or escape of the pollutant was 'sudden and accidental.'" *Id.* at 334, 380 S.E.2d at 687. Examining the purpose of that early pollution clause, the court in *Claussen*

Sandersville Railroad reads *Bituminous Casualty* to create a two-part test for the application of pollution exclusions. (Doc. 23 at 2). First, an insurer must prove that the occurrence arose out of, in the case of Evanston's policy, some *dispersal, seepage, migration, release, or escape* of a contaminant. (Doc. 23 at 2). (Sandersville Railroad collectively calls these the "release/escape" terms. (Doc. 23 at 1-2)). Second, the insurer must prove that the contaminant causing the injury was a pollutant. (Doc. 23 at 2).

Sandersville Railroad focuses on the first part of the test.[6] Because the policy does not define the release/escape terms, Sandersville Railroad argues that a layman would understand the release/escape terms to mean that the pollutant must have been released or must have escaped from some "area where it was being contained, produced, or was expected to be." (Doc. 18-1 at 8). In language that seems right out of the dead debate over the scope of pollution exclusions, Sandersville Railroad argues "[i]ndeed, this interpretation—that there must be an actual release or escape—also is consistent with the ordinary and common sense understanding of the concept of 'pollution.'" (Doc. 18-1 at 8). Claiming that the Georgia Supreme Court has not addressed this "element" of the pollution exclusion, Sandersville Railroad argues that

---

noted that the exclusion was intended to apply only to intentional polluters, and at the time, the insurance industry represented "'that the impact of the [pollution exclusion clause] on the vast majority of risks would be no change.'" *Id.* at 337, 380 S.E.2d at 689 (quoting *Claussen v. Aetna Cas. & Sur. Co.*, 676 F. Supp. 1571, 1573 (S.D. Ga. 1987)). Right or wrong, as a matter of good policy or bad, the insurance industry has changed both its tune and the wording of the pollution exclusion.

[6]   Sandersville Railroad makes a token argument that iron, the source of the toxic fumes that caused Flowers's injury is not unambiguously a "pollutant." (Docs. 18-1 at 16-17; 23 at 12 n.8). It claims that because iron is "an essential element for human health and has important industrial uses," iron is not unambiguously an "irritant" or "contaminant." (Doc. 18-1 at 17). The policy defines pollutant as "any … gaseous . . . irritant or contaminant, including smoke, vapor . . . and fumes." (Doc. 18-3 at 44). The medical records Sandersville Railroad placed in the record show that Flowers contracted siderosis from welding fumes containing iron particles, which are described as "respiratory toxins." (Doc. 18-6 at 5). Fumes containing respiratory toxins clearly and unambiguously are irritants or contaminants.

this Court is bound by *Bituminous Casualty* and thus must grant summary judgment in its favor. (Docs. 18-1 at 12; 23 at 10-11; 28 at 4-9).

On issues of state law, a federal court is bound by the decisions of the state supreme court. *World Harvest Church, Inc. v. Guideone Mut. Ins. Co.*, 586 F.3d 950, 957 (11th Cir. 2009). Of course, district courts are also bound by the decisions of the Eleventh Circuit, but the Eleventh Circuit has recognized that when "state law changes or is clarified in a way that is inconsistent with the state law premise of one of our earlier decisions, the prior panel precedent rule does not bind us to follow our earlier decision." *Id.* (quoting *United States v. Johnson*, 528 F.3d 1318, 1320 (11th Cir. 2008)). It is clear that state law has changed since the Eleventh Circuit's decision in *Bituminous Casualty* in a way that undermines the precedential value of *Bituminous Casualty*. Georgia law now recognizes pollution exclusions as absolute, and it is clear that pollution exclusions cannot be interpreted in the light of an assumed purpose of applying only to traditional environmental pollution claims. Although the Eleventh Circuit assumed some twenty years ago in *Bituminous Casualty* that Georgia was in the traditional pollution-interpretation camp, and likely it was then, that assumption does not hold today.

Sandersville Railroad, however, argues that *Bituminous Casualty* remains viable and binding on this Court because it focused on the ambiguity of the release/escape terms while the Georgia Supreme Court in *Georgia Farm Bureau* and *Reed* focused on the meaning of "pollutants." (Doc. 28 at 1-2). Strictly speaking, that is true, but the determinative and overarching issue resolved by the supreme court was whether Georgia would join those jurisdictions holding that pollution exclusions are absolute and unambiguous. The court's rejection of the traditional interpretation impacts the

interpretation of the entire pollution exclusion.  Once again, the Eleventh Circuit's conclusion that a pollution exclusion was ambiguous was based on the then understanding of the purpose of pollution exclusions under Georgia law.  That is, because the purpose of the pollution exclusion was to bar claims for environmental contamination rather than claims arising out of the intended use of a product, the release/escape terms were ambiguous.

Given that Georgia now interprets pollution exclusion clauses to be absolute and unambiguous, it is clear that the release/escape terms unambiguously include the means by which Flowers was injured by a pollutant.  According to Sandersville Railroad, Flowers suffered from siderosis, an occupational lung disease caused by exposure to iron.  (Doc. 19-1, ¶¶ 8-9).  Flowers alleged that Sandersville Railroad was negligent because it failed to provide proper equipment for safe welding, failed to provide adequate ventilation in areas where he welded, failed to provide procedures and safeguards for breathing protection, failed to warn and train him of the dangers and signs of occupational lung disorders, and failed to provide proper supervision.  (Doc. 20-4, ¶ 6).  In short, Flowers was injured from exposure to toxic fumes resulting from his welding activities.  His exposure to those fumes happened because welding led to their release, or escape, or dispersal, or seepage.  (Docs. 20-4, ¶¶ 4-6; 18-10; 23-2, ¶ 1).  Reference to a dictionary is not necessary to see that the escape/release terms clearly encompass fumes released by welding.

Recognizing this, Sandersville Railroad is forced to invoke the defunct traditional interpretation of the pollution exclusion.  It argues there must be an actual release or escape from "containment" because that is the "ordinary and common sense

-14-

understanding of the concept of 'pollution.'" (Doc. 18-1 at 8).  The pollutant, Sandersville Railroad argues, "must have been released or escaped from where it was expected to be to someplace where it was not wanted."  (Doc. 23 at 2).  Apparently Sandersville Railroad contemplates that the pollutant must have escaped from an impound, or a vat, or some similar contaminant where a polluter had stored its pollutants.  This is an argument mired in the traditional environmental-pollution interpretation of pollution exclusions.  It is an argument simply not viable after the Georgia Supreme Court's decision in *Georgia Farm Bureau*.  Nothing in Evanston's absolute pollution exclusion suggests the limits Sandersville Railroad seeks to impose.  Flowers was exposed to toxic fumes released by welding.  The purpose of the pollution exclusion is to absolutely exclude claims for injuries caused by pollutants.  Given that purpose, there is no ambiguity here.  Flowers welded, pollutants escaped or were released, and he was injured.  The absolute pollution exclusion excludes coverage for his claim just as it excluded coverage in *Georgia Farm Bureau* for claims by apartment residents exposed to lead from deteriorating paint and in *Reed* for claims for exposure to carbon monoxide.

Sandersville Railroad next argues that interpreting the policy to exclude coverage for Flowers's claim would render the policy "largely illusory."  (Doc. 23 at 5).  Sandersville Railroad cites no authority for this argument, and it does not directly argue that the exclusion violates public policy because it takes away coverage for FELA claims, coverage which Sandersville Railroad bargained for.  Certainly the utility of a policy intended to cover FELA claims but excluding coverage for a broad category of often expensive occupational disease claims is questionable.  But the exclusion does

-15-

not on its face abrogate coverage for FELA claims, and Sandersville Railroad adduces no evidence that, in practice, the application of a pollution exclusion in a policy covering FELA claims would effectively abrogate the policy's grant of coverage. Indeed, common sense suggests that occupational disease claims arising from exposure to pollutants are a small subset of FELA claims.

Although not addressing directly this argument, the Fifth Circuit has addressed the viability of pollution exclusions in CGL policies modified to cover FELA claims. In *Columbia Casualty Co. v. Georgia & Florida Railnet, Inc.*, 542 F.3d 106 (5th Cir. 2008), a railroad, coincidentally a Georgia railroad, had purchased a CGL policy to insure its FELA obligations. *Id.* at 107. Like Evanston's policy, the policy contained an exception to the employer's liability exclusion so that FELA claims would be covered. *Id.* at 108. When an employee sued the railroad in a Georgia state court alleging that he had been injured as a result of exposure to exhaust fumes, the insurer denied coverage based on the policy's pollution exclusion. *Id.* at 109. The railroad argued that because the policy specifically included FELA claims within the scope of coverage, and because other exclusions contained exceptions for FELA claims, the policy should be construed to provide coverage for the employee's occupational disease claim. *Id.* at 112. In short, as the railroad argued, "the inclusion trumps the exclusion." *Id.* Applying Texas law, the district court found that the pollution exclusion applied notwithstanding the grant of coverage for FELA claims. *Id.* at 110. The Fifth Circuit affirmed, concluding that the railroad's argument proved exactly the opposite point. *Id.* at 113. Given that the policy provided exceptions for FELA to some exclusions, the fact that there was no exception in the pollution exclusion demonstrated the intent that the pollution exclusion would

apply to FELA claims.  *Id.*  Evanston's policy similarly provides exceptions for some exclusions so that the exclusions will not bar FELA claims.  Because the pollution exclusion contains no such exception, it is clear that the parties intended the pollution exclusion to apply to FELA claims.

Finally, Sandersville Railroad argues that the pollution exclusion does not apply unless the "release/escape of the pollutant [was] the 'but for' cause of the injury."  (Doc. 18-1 at 15).  Sandersville Railroad interprets but-for causation to mean that the pollution exclusion is inapplicable unless "exposure to iron from welding, standing alone, caused the injury."  (*Id.* at 16).

Sandersville Railroad relies on *Barrett v. National Fire Insurance Co. of Pittsburgh*, 304 Ga. App. 314, 696 S.E.2d 326 (2010), to support its but-for causation argument.  In *Barrett*, the plaintiff, who was working under the supervision of employees of a natural gas company, was injured while working in an excavation ditch where a natural gas pipeline was being installed.  *Id.* at 316, 696 S.E.2d at 328.  He worked for about two hours in the ditch and only took two or three short breaks.  *Id.*  Because he was working under a rain poncho, natural gas accumulated, creating an oxygen-deficient atmosphere under the poncho, and the plaintiff suffered a brain injury as a result.  *Id.*

The plaintiff alleged that the natural gas company's employees were negligent because, despite their training and expertise, they allowed him to work in the conditions that caused his injuries.  *Id.*, 696 S.E.2d at 328-29.  The plaintiff obtained a judgment against the natural gas company and, after taking an assignment of the natural gas company's rights against its insurer, filed suit against the insurer to collect the judgment.

*Id.* at 317, 696 S.E.2d at 329.  Relying on a pollution exclusion, the insurer moved to dismiss the complaint, contending that the plaintiff's allegations established as a matter of law that the pollution exclusion excluded coverage for the claim.  *Id.*  The trial court granted the motion.  *Id.*

The Georgia Court of Appeals reversed, holding that the phrase "arising out of" in insurance policy exclusions must be interpreted narrowly by "applying the 'but for' test traditionally used to determine cause-in-fact for tort claims."  *Id.*  The record indicated that it was possible to work safely in the presence of natural gas, and the complaint alleged that the plaintiff's injuries were caused by the negligence of the natural gas company's employees, not by exposure to natural gas.  *Id.* at 322, 696 S.E.2d at 332. Indeed, according to the complaint, the plaintiff's brain injury resulted from a lack of oxygen, not exposure to a pollutant.  *Id.*

Relying on *Barrett*'s but-for causation analysis, Sandersville Railroad argues that "there is no showing that [Flowers's] exposure to iron from welding, *standing alone*, caused the injury."  (Doc. 18-1 at 16) (emphasis added).  This argument misses the mark by a wide margin.  First, Sandersville Railroad's interpretation of *Barrett* would read the entire pollution exclusion (or any other policy exclusion for that matter) completely out of the policy.  It is almost certain that a pollutant, standing alone, never causes an injury.  In any case involving injury from exposure to a pollutant, there will be other acts that contributed to the event.  Nothing happens in a vacuum; someone or

something will have done or failed to do something that led to the circumstances allowing exposure to the pollutant.[7]

Second, Sandersville Railroad mistakenly reads but-for causation to mean sole causation, i.e., "standing alone."  It does not.  On the contrary, but-for causation broadly defines causation, requiring only an act or omission without which the event would not have occurred.  As we saw in *Palsgraf v. Long Island Railroad. Co.*, 162 N.E. 99 (N.Y. 1928), but for a railroad guard's effort to help a passenger, the passenger's bag containing fireworks would not have fallen to the railroad platform, the fireworks would not have exploded, a shock from the blast would not have tipped over scales some distance away, and the plaintiff would not have been injured.  Or, to use a common law school example, but for the ringing of the plaintiff's alarm clock, the plaintiff would not have awaken, and if she had not awakened, she would not have been driving through an intersection later in the morning where she was struck by the defendant's vehicle.  Both the guard and the clock are but-for causes of injuries, but, thanks to Justice Cardozo, we know they are not the proximate cause of those injuries.  The number of but-for causes of any particular event is limited only by the time available to conjure them up.  While but-for causation analysis is important to determine actual cause, to suggest that but-for causation has somehow come to mean sole causation would turn the whole concept of causation on its head.[8]

---

[7]    Judge Duffey in the Northern District of Georgia also made this point when he rejected an argument that *Barrett* limited the scope of pollution exclusions: "All injuries caused by exposure to pollution will in some sense be caused by an act that causes the release of pollution.  But *Barrett* did not purport to broadly repudiate the enforceability of pollution exclusions."  *Racetrac Petroleum, Inc. v. Ace Am. Ins. Co.*, 841 F. Supp. 2d 1286, 1294 (N.D. Ga. 2011).

[8]    Not surprisingly, cases citing *Barrett* for its but-for causation requirement for coverage exclusions, apply a traditional but-for causation analysis rather than a sole cause or "standing alone" analysis.  *See*

The Court recognizes that isolated, and unusual, language in *Barrett*—standing alone—has fueled Sandersville Railroad's argument, but a close reading reveals that *Barrett* is not applicable here regardless of what the court meant by "standing alone." *Barrett*, 304 Ga. App. at 321, 696 S.E.2d at 332.  The Georgia Court of Appeals simply concluded that the trial court erred in granting the insurer's motion to dismiss based on the allegations of the complaint.  Based on those allegations, the Court concluded "a question exists as to whether the pollution exclusion applies."  *Id.* at 320, 696 S.E.2d at 331.  The allegations of the complaint, to the Georgia Court of Appeals, indicated that the cause of the lack of oxygen that injured Barrett was the negligence of the gas company employees.  *Id.* at 319, 321, 696 S.E.2d at 330, 332.  Thus, the court simply ruled that it could not be said as a matter of law that the release of the natural gas was a but for cause of Barrett's injury.  Here, the Court has a developed record establishing that the pollution exclusion applies.

In sum, based on the summary judgment record, the pollution exclusion bars coverage for Flowers's claims, and Evanston has no duty to indemnify Sandersville Railroad and no further duty to defend against the Flowers claim.

## C.   Reimbursement of Defense Costs

The remaining issues are: (1) whether, based on the allegations of Flowers' complaint rather than on the broader summary judgment record, Evanston owed a duty to defend Sandersville Railroad after the exhaustion of its self-insured retention; and, if it is determined that Evanston had no such duty, (2) whether, pursuant to its reservation

---

*Langdale Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Penn.*, 609 F. App'x 578, 588 (11th Cir. 2015); *Hays v. Ga. Farm Bureau Mut. Ins. Co.*, 314 Ga. App. 110, 114, 722 S.E.2d 923, 927 (2012).  Further, *Blacks Law Dictionary* makes clear that but-for cause is a synonym for actual cause, cause-in-fact, and factual cause. *Cause, Black's Law Dictionary* (10th ed. 2014).

of rights letter, Evanston can recoup the defense costs tendered to Sandersville Railroad.

The parties' briefs jump straight to the second issue without relation to, or thorough briefing of, the first issue.  The first issue needs to be addressed before the second issue can be.

Sandersville raises the duty to defend issue only once, by way of one short paragraph in its opening brief. (Doc. 18-1, 17).  Without any support from the record or further analysis, Sandersville Railroad makes the bare assertion that: "The facts alleged in the *Flowers* complaint in no way unambiguously exclude coverage." (*Id.*).

Evanston, on the other hand, ignores the duty to defend issue (and Sandersville Railroad's above statement) entirely.  Yet, Evanston sought summary judgment as to all Counts of the Complaint.  Count I seeks "a declaration that the claims alleged against Sandersville Railroad *in the [Flowers suit]* are not covered . . . and that [Evanston] has no duty to defend any party for the claims." (Doc. 1, ¶ 28) (emphasis added).  Count III seeks a "declaration that the claims alleged against Sandersville Railroad *in the [Flowers suit]* are not covered." (*Id.*, ¶ 32) (emphasis added).

Furthermore, when the Court held a conference to address this concern with the parties, it was even more evident that the parties needed a further opportunity to develop the duty-to-defend issue.  For example, at the conference, Evanston argued for the first time that its duty to defend terminated once it discovered true facts demonstrating noncoverage.  For this proposition, Evanston cited *Colonial Oil Industries Inc. v. Underwriters Subscribing to Policy Nos. TO31504670 & TO31504671*, 268 Ga. 561, 491 S.E.2d 337 (1997).

-21-

However, *Colonial Oil* merely establishes that an insurance company has no duty to investigate whether there are true facts outside of the complaint that might bring the action *within* coverage.  It did not upset Georgia's longstanding rule that mere discovery of true facts showing a claim to be outside of coverage does not destroy the insurer's duty to defend against a complaint that is pled such that it could fall within the insured's coverage.  *Loftin v. U.S. Fire Ins. Co.*, 106 Ga. App. 287, 290, 127 S.E.2d 53, 56 (1962).  "The insurer is obligated to defend where . . . the allegations of the complaint against the insured are ambiguous or incomplete with respect to the issue of insurance coverage."  *Penn-Am. Ins. Co. v. Disabled Am. Veterans, Inc.*, 268 Ga. 564, 565, 490 S.E.2d 374, 376 (1997).  In short, the rule in Georgia is that: "it is only where the complaint sets forth true factual allegations showing no coverage that the suit is one for which liability insurance coverage is not afforded and for which the insurer need not provide a defense."  *Id.*

As Evanston acknowledged at the conference, only if the first issue—duty to defend based on the allegations in Flowers's complaint—is resolved in favor of Evanston, does the Court need to address the second question—whether an insurance company can recoup defense costs under a reservation of rights letter where it is determined that the insurer had no duty to defend.  This question is an issue of first impression in Georgia,[9] and the Court will not rule on the question until the parties have properly addressed the underlying issues.

---

[9]   Evanston states that "Georgia cases have held there is a right to reimbursement of defense costs, where the insurer expressly reserves that right in a bilateral reservation of rights letter."  (Docs. 20 at 2; 20-1 at 15).  However, Georgia cases have not so held. The Georgia Court of Appeals recently confirmed that this issue is a matter of first impression in Georgia.  *Ga. Interlocal Risk Mgmt. Agency v. City of Sandy Springs*, 2016 WL 3027526, at *4 (Ga. Ct. App.).

The Court accordingly **DENIES without prejudice** the parties' cross-motions for summary judgment as to whether Evanston had a duty to defend Sandersville Railroad after the exhaustion of Sandersville Railroad's self-insured retention, and **DENIES without prejudice** the parties' cross-motions for summary judgment as to whether Evanston can recoup its defense costs from Sandersville Railroad.  The parties may renew their motions for summary judgment on these issues by way of motions filed with briefs addressing these remaining issues.

**SO ORDERED**, this 29th day of September, 2016.

S/ Marc T. Treadwell
MARC T. TREADWELL, JUDGE
UNITED STATES DISTRICT COURT